**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES MOYER<br>3050 Fairview Drive<br>Avon, Ohio 44011 | :<br>:<br>: |
| | : |
| and | :   Case No. 2:23-cv-00578 |
| ALYSSA PALERMO<br>5633 Bartonsville Road<br>Frederick, Maryland 21704 | :<br>:<br>: |
| | :   Judge Michael H. Watson |
| and | : |
| | : |
| VINCENT HARRIS<br>6121 Virginia Drive<br>Auburn, California 95602 | :<br>:   Magistrate Judge Elizabeth P. Deavers<br>: |
| | : |
| and | : |
| | : |
| BRANDON HARRIS<br>7900 Sisson Lane<br>Auburn California 95602 | :<br>:<br>: |
| | : |
| and | : |
| | : |
| NATHANIEL MCCRACKEN<br>277 Collett Road<br>Bowling Green, Kentucky 42104 | :<br>:<br>: |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| GOVERNMENT EMPLOYEES INSURANCE COMPANY<br>1314 Douglas Street, Suite 1400<br>Omaha, Nebraska 68102 | :<br>:<br>: |
| | : |
| and | : |
| | : |
| GEICO INSURANCE AGENCY, LLC<br>f/k/a GEICO Insurance Agency, Inc.<br>5260 Western Avenue<br>Chevy Chase, Maryland 20815 | :<br>:<br>:<br>: |
| | : |

and                                  :
                                     :
GEICO CORPORATION                    :
5260 Western Avenue                  :
Washington, DC 20015                 :
                                     :
and                                  :
                                     :
ABC BENEFIT PLANS 1-15               :
                                     :
            Defendants.              :
                                     :
                                     :
                                     :
                                     :
                                     :

## FIRST AMENDED CLASS ACTION COMPLAINT

Now come Plaintiffs James Moyer, Alyssa Palermo, Vincent Harris, Brandon Harris, and Nathaniel McCracken (collectively, "Plaintiffs"), in their individual and representative capacity, and for their Complaint against Defendants (collectively, "the Defendants") hereby states the following:

## INTRODUCTION

1.      Defendants have employed hundreds of captive insurance agents like Plaintiffs across all fifty states to sell the company's insurance products.

2.      While Defendants may call its captive insurance agents independent contractors (and indeed, they may have been independent contractors many years ago), Defendants no longer treat them as such. Instead, over time, Defendants started to exercise more and more control over their captive insurance agents such that those captive insurance agents are now Defendants' employees. The changes to the financial and management structure within the past three to six

2

years, among other things, between Defendants and its captive insurance agents[1] demonstrates that such agents, like Plaintiffs here, are Defendants' employees.

3.    Defendants now in 2023 (a) control the location and appearance of its captive insurance agents' offices; (b) control who can be their clients and how they obtain new clients; (c) assign additional duties to the captive insurance agents outside of any contractual agreement; (d) require its captive insurance agents' employees to work for Defendants' corporate offices without compensation to the agents; and perhaps most importantly, (e) allow its captive insurance agents to opt into Defendants' *employee* health and life insurance benefits.  Together, these factors and others support the conclusion that Defendants' captive insurance agents are actually employees, not independent contractors.

4.    Congress enacted the Employee Retirement Income Security Act ("ERISA") to provide protections for employees regarding benefit plans offered by their employers.  *See* 29 U.S.C. § 1001(a).  Because Defendants allow its captive insurance agents to opt into Defendants' employee health and life insurance benefits—making the captive insurance agents eligible to receive a benefit from Defendants' employee benefit plans—the captive insurance agents, including Plaintiffs, are "participants" under ERISA.  *See* 29 U.S.C. § 1002(7).

5.    As employees and participants, the protections of ERISA apply to them.

6.    Because of the excessive amount of control Defendants now exercise over its captive insurance agents in 2023, such agents are rightfully classified as employees, and not independent contractors. However, Defendants misclassify their captive insurance agents as

---

[1] A "captive" insurance agent is an insurance agent who by agreement with a particular insurance company agrees to only sell insurance products issued by and on behalf of that single insurance company. An "independent" insurance agent is authorized to sell on behalf of multiple insurance companies.

independent contractors, and they fail to provide their captive insurance agents *all* of the same retirement, health, and other benefits they provide to other employees through several employee benefit pension and welfare plans established under ERISA.

7. By misclassifying their captive insurance agents, like Plaintiffs, Defendants have avoided the business costs of extending *all* ERISA-protected benefits to their captive insurance agents and have evaded compliance with state and federal laws governing employee benefit plans.

8. Plaintiffs bring this action, on behalf of themselves and all others similarly situated, against Defendants for violations of ERISA.

9. Furthermore, after Mr. Moyer filed his initial complaint against Defendants, they, without any legitimate justification, unlawfully retaliated against Mr. Moyer by terminating his employment with GEICO. Such retaliatory termination violates 29 U.S.C. § 1140.

## JURISDICTION

10. This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 because this action arises under the laws of the United States and specifically over Plaintiffs' ERISA claims under 29 U.S.C. §§ 1132(e)(1) and 1140.

11. This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which (1) the claims of the proposed Class exceed $5,000,000; (2) at least one member of the class of Plaintiffs is a citizen of a state different from at least one Defendant; and (3) the proposed Plaintiff Class consists of more than 100 members.

12. This Court has personal jurisdiction over Defendants because Defendants do business in Ohio, and a substantial number of the events giving rise to the claims took place in Ohio.

13.     Pursuant to 28 U.S.C. 1391(c)(2), all Defendants are residents of Ohio, and one or more of the Defendants are residents of this judicial district.  Therefore, venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(1).

**PARTIES**

14.     Plaintiff James Moyer ("Mr. Moyer") was a captive insurance agent for Defendants and resides at 3050 Fairview Drive, Avon, Ohio in Lorain County.  Mr. Moyer's insurance office was located in North Olmsted, Ohio.  Mr. Moyer was an agent from August 2007 through April 2023.

15.     Plaintiff Alyssa Palermo ("Ms. Palermo") was a captive insurance agent for Defendants and resides at 5633 Bartonsville Road, Frederick, Maryland in Frederick County. Ms. Palermo's insurance office was located in Frederick, Maryland. Ms. Palermo was an agent from December 2006 through March 2022.

16.     Plaintiff Vincent Harris ("Mr. V. Harris") was a captive insurance agent for Defendants and resides at 6121 Virginia Drive, Auburn, California in Auburn County.  Mr. V. Harris's insurance office was located in Sacramento, California.  Mr. V. Harris was an agent from November 2008 through July 2022.

17.     Plaintiff Brandon Harris ("Mr. B. Harris") was a captive insurance agent for Defendants and resides at 7900 Sisson Lane, Auburn, California in Auburn County.  Mr. B. Harris's insurance office was located in Roseville, California.  Mr. B. Harris was an agent from March 2021 through July 2022.

18.     Plaintiff Nathaniel McCracken ("Mr. McCracken") is a captive insurance agent for Defendants and resides at 277 Collett Road, Bowling Green, Kentucky in Warren County.  Mr.

McCracken's insurance office is located in Bowling Green, Kentucky. Mr. McCracken has been an agent since June 2021.

19.     Defendant Government Employees Insurance Company ("GEICO") is a Nebraska corporation with its principal place of business located in Omaha, Nebraska. GEICO conducts substantial business in the State of Ohio.

20.     GEICO Insurance Agency, LLC ("GEICO Insurance Agency") was formerly known as GEICO Insurance Agency, Inc. and is a limited liability company organized under the laws of Maryland with its principal place of business in Chevy Chase, Maryland. GEICO Insurance Agency conducts substantial business in the State of Ohio.

21.     GEICO Corporation is a Delaware corporation with its principal place of business in the District of Columbia. GEICO Corporation conducts substantial business in the State of Ohio.

22.     The parent corporation of Defendants Government Employees Insurance Company and GEICO Insurance Agency, LLC, is Defendant GEICO Corporation. GEICO Corporation is a wholly owned subsidiary of National Indemnity Company, and an indirect, wholly owned subsidiary of Berkshire Hathaway Inc., a publicly held corporation.

23.     ABC Benefit Plans 1-15 are the administrators of Defendants' ERISA benefit plans. Defendants no longer allow Plaintiffs to access the information regarding the plan administrators; and therefore, the names and addresses of the ABC Benefit Plans are unknown at this time and could not be reasonably ascertained and/or discovered prior to the filing of this complaint after conducting a reasonable search.

## FACTS

24.     The central inquiry in determining whether an individual is an employee or independent contractor is "the hiring party's right to control the manner and means by which the product is accomplished." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992). "Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." *Id.* at 923-24.

25.     All of these factors "must be assessed and weighed with no one factor being decisive." *Id.* at 924.

*Originally, These Factors Would Have Weighed in*
*Favor of Independent Contractor Status.*

26.     Early in the relationship between Defendants and Plaintiffs Mr. Moyer, Mr. V. Harris, and Ms. Palermo, Defendants did not exercise as much control over its agents, meaning that an assessment of the factors would have weighed in favor of independent contractor status.

27.     However, some of the factors have always favored (and still favor) employee status:

    a.  the required skills,

    b.  the work being part of Defendants' regular business,

    c.  the Defendants being in business, and

    d.  the provision of select employee benefits.

28.     The selling of insurance products is the primary aspect of Defendants' regular business.

29.     Defendants employ hundreds of captive insurance agents to exclusively sell Defendants' insurance products or products Defendants have contracted to sell.  Defendants also directly sell insurance products to consumers. The individuals who Defendants properly classify as employees and who also sell insurance products to customers are referred to as call center agents.  The call center agents generally work in call centers throughout the country, and they hold the same licenses, use the same systems to process applications, and sell the same products as captive insurance agents.

30.     Defendants provide their call center agents training in the "GEICO Way" of selling insurance.  This training includes sales and underwriting training in a classroom with an instructor wherein the call center agents are taught GEICO's five-step closing process.  After the in-class sales training, Defendants provide coaching to the call center agents, which involves listening into calls and providing feedback.

31.     Defendants likewise require all captive insurance agents to attend GEICO training. The substance and format of the training is the same as the training for call center agents.  Captive insurance agents must attend in-classroom sales and underwriting training wherein they learn the "GEICO Way," including Defendants' five-step closing process.  The training also includes the same coaching that call center agents receive.  In fact, part of the captive insurance agents' training occurred in Defendants' call centers.

32.     Furthermore, all captive insurance agents must attend Defendants' training even if those agents previously sold insurance in another capacity.  Defendants seek to provide both captive insurance agents and call center agents with the skills needed to sell insurance for GEICO.

33.     Captive insurance agents, like Plaintiffs, are eligible to select health and life insurance from Defendants' ERISA-controlled plans.  In selecting a health and/or life insurance policy, the captive insurance agent is required to cover 100 percent of the premiums.  Defendants' call center agents receive a discount/subsidy from Defendants for their health and life insurance premiums.  Mr. Moyer has purchased health and life insurance from Defendants' ERISA-controlled plans, paying 100% of the applicable premiums.

*Within the Past Six Years, Defendants Have Wrested Control over the Manner and Means by Which Captive Insurance Agents Work, Hereby, Transforming the Relationship into an Employer-Employee Relationship*

34.     Within the past three to six years, Defendants started treating Plaintiffs and other captive insurance agents the same as the call center agents.  Defendants' increased level of control over the manner and means by which Plaintiffs provided services transformed the prior independent contractor relationship into an employer-employee relationship.  And an assessment of the factors now in 2023 weighs strongly in favor of employee status.

35.     Defendants in 2023 are now the source for many of the instrumentalities and tools used by captive insurance agents, including the following:

a.  Defendants controlled and owned the lists of Plaintiffs' potential customers.

   i.  In prior years, Plaintiffs were free to develop relationships with car dealerships on their own terms.  However, within the past three to six years, Defendants have taken control over agents' relationships with dealerships.

   1.  Mr. Moyer developed successful relationships with dealerships in Northeast, Ohio.  Instead of allowing Mr. Moyer to continue those relationships, Defendants required Mr. Moyer to provide them with the list of dealerships with which Mr. Moyer did business.

Defendants then divided Mr. Moyer's dealership relationships between Mr. Moyer and other captive insurance agents. Defendants thereafter prohibited Mr. Moyer from obtaining customers from dealerships that Defendants gave to other agents.

2. Mr. V. Harris started his dealership business with only a select group of high-end dealerships. Mr. V. Harris did not work with smaller dealerships, such as small used car lots. However, Defendants took control of Mr. V. Harris's business and required him to build relationships with all dealerships. Then, when Defendants realized that such relationships were not profitable, Defendants prohibited Mr. V. Harris from having relationships with certain dealerships.

ii. Defendants prohibited Plaintiffs from purchasing sales leads, so Plaintiffs' only customers were those individuals that contacted their offices.

iii. Defendants required certain new customers to submit paper applications as an additional step in the approval process, which delayed or prevented the sale of insurance products. However, these same individuals could apply online and obtain the same insurance with Defendants without submitting a paper application.

iv. Defendants directed captive insurance agents to develop relationships with universities, including requiring the captive insurance agents to attend university events and functions.

v. In the past three to six years, Defendants also established mandatory quotas and timelines for captive insurance agents relating to unsold internet quotes.

10

b. Defendants control the telephones, telephone numbers, computer operating systems, and websites used by Plaintiffs.

   i. When a captive insurance agent obtained a phone number for his or her office, Defendants required the agent to assign the phone number to GEICO. Defendants, therefore, own all phone numbers.

   ii. Initially, captive insurance agents purchased their own phone systems for their offices. However, in 2020, Defendants required all captive insurance agents to switch to Defendants' phone systems (which was the same system used by call center agents) so that Defendants could monitor all calls.

   iii. Defendants also required Plaintiffs to lease computers from the Defendants and prohibited captive insurance agents from having software programs added to the computers. For example, Mr. Moyer was prohibited from attaching a printer of his choice to Defendants' computer unless and until he obtained approval from Defendants. And Ms. Palermo was unable to use a USB drive with the computers.

   iv. Defendants further own the Plaintiffs' websites, including designing and controlling those websites.

c. Defendants control and own all of the marketing materials, including logos and signs used by Plaintiffs.

   i. Captive insurance agents cannot advertise for business without the express approval of Defendants, which is rarely given.

   ii. Defendants do not allow captive insurance agents, including Plaintiffs, to respond to Google reviews or other customer complaints or compliments.

Defendants instead respond to internet reviews as if they were the captive insurance agent.

iii. Defendants also control all social media.  For example, Defendants designed Plaintiffs' Facebook pages, and Defendants had to approve all postings.  Defendants further kept restricting what Plaintiffs could post and then made the decision to discontinue Plaintiffs' use of Facebook pages.

iv. Defendants also controlled the vendors Plaintiffs could use to provide marketing materials.

v. Furthermore, in the past three to six years, Defendants drastically increased their control over marketing.

1. Ms. Palermo had advertised as doing business in a four-state region. Her voicemail noted her region and the logos on her vehicle noted her region, all of which was approved by Defendants. However, when Ms. Palermo drove to Defendants' corporate headquarters, a vice-president determined that he did not want her to advertise in that manner.  Defendants then changed her voicemail greeting and required her to take the logos off her vehicle.

2. Defendants required Mr. V. Harris to switch from radio advertisements to digital marketing.

3. Defendants required Mr. B. Harris to market in gyms and outdoor malls.

d. Defendants also control and own the telephone scripts.

     i.   Defendants required Plaintiffs and their office staff to use Defendants telephone scripts when selling insurance products to potential customers. The entire script that Defendants required was on the screens of the GEICO-provided computers. Captive insurance agents cannot exercise their own judgment on how they interact with customers.

    ii.   Defendants monitor office staff and suspend captive insurance agent's staff when staff deviate from the script. For example, Defendants determined that one of Ms. Palermo's staff made a "critical quality error" by saying "as soon as possible" instead of "immediately." In such instances, Defendants have suspended access to the computer system used by captive insurance agents' office staff when Defendants deem there to be violations of the script and process mandated to be used in selling insurance products.

   iii.   Defendants also suspend staff if they asked the customer certain questions. For example, if a customer was adding a car, the captive insurance agents would typically ask if that customer would drive the car the same number of miles as their other car. However, staff were not permitted to ask if the customer would be driving the other car less now because the customer has a second car. If staff inquired about the number of miles that would be driven with a second car, Defendants would suspend and/or terminate them.

36.    Defendants control the location and appearance of Plaintiffs' offices.

   a.   Defendants require captive insurance agents to maintain offices in specific locations based on criteria established by Defendants. Defendants further require

captive insurance agents to have offices of a certain size and do not permit smaller offices.

b. Earlier in the relationships, Defendants purported to hold a contest regarding captive insurance agent's offices and required submission of videos showing all aspects of the agent's office. In 2022, Defendants changed course and simply required captive insurance agents to submit videos of every area of their office in order to be evaluated.

c. Defendants also control the regions and locations in which Plaintiffs can seek business.

37. The duration and manner of the relationship between Defendants and Plaintiffs demonstrates that they are employees of Defendants. Mr. Moyer was a captive agent for over 15 years. Mr. V. Harris was an agent for 14 years. Ms. Palermo was a captive agent for 16 years.

36. Defendants also maintain the right to assign additional projects to Plaintiffs.

a. For example, all of the Defendant-owned telephone numbers are intermingled. Therefore, when a customer calls a corporate number, that call could be, and sometimes was, routed to Plaintiffs' offices.

b. Defendants also require captive insurance agents to provide service assistance to any GEICO insured who contacted a captive insurance agent's office or who was routed to the office. These service calls were not limited to the captive insurance agent's customers. Defendants required the captive insurance agents to provide services for free to corporate customers and even other captive insurance agents' customers.

    c.   During the COVID-19 pandemic, the number of service calls captive insurance agents received from corporate customers greatly increased. Throughout the pandemic, Defendants had difficulty handling all of the corporate service calls in a timely manner. Yet, instead of hiring enough call center customer service employees to handle the calls, Defendants continued to burden captive insurance agents with an ever-increasing number of corporate callers.

    d.   Defendants also requested that Mr. V. Harris and other captive insurance agents prepare training materials and classroom instruction for new captive insurance agents. Defendants did not pay the captive insurance agents for their time.

    e.   Because Ms. Palermo had a staff member who spoke Spanish, Defendants sent Spanish-speaking callers requesting service to Ms. Palermo's office. Defendants required Ms. Palermo to accept these calls, but they did not compensate Ms. Palermo for this added work.

37.    Defendants maintain control over the specific days and the precise hours when Plaintiffs' offices were open because Defendants designed Plaintiffs' websites, which contained an office's days and hours of operation. To ensure compliance with these day and time requirement, Defendants routinely check and monitor captive agents' telephone calls.

38.    Defendants also controlled whether captive insurance agents could close in-person services during the COVID-19 pandemic. Upon inquiries from captive insurance agents, Defendants initially told captive insurance agents that they had to keep their offices open for in-person business and even threatened to terminate any captive insurance agent that closed in-person services. Defendants then changed course and directed that captive insurance agents could close their offices. Then after some time had passed, Defendants informed the captive insurance agents

that they expected all captive insurance agents (even those at higher risk for COVID complications) to reopen their offices by a certain date.

39.     Defendants also require captive insurance agents to attend mandatory meetings with supervisors, who are full time employees of the Defendants.  Captive insurance agents and their office staff must complete Defendants' training modules and must follow Defendants' record retention policies.  Defendants also set performance goals for each captive insurance agent's business and monitor these goals.  In instances when these performance goals are not met, Defendants impose discipline on the captive insurance agents, including warnings and even termination of the captive insurance agents.

40.     Defendants paid Plaintiffs solely in the form of commissions.  However, Defendants could modify the amount of commissions at any time without the consent of the captive insurance agents.

41.     Defendants also have a significant role in hiring and disciplining Plaintiffs' office staff.  Defendants impose qualifications on hired staff, including a requirement to conduct a background check, and Defendants determine if Plaintiffs and other captive insurance agents are able to hire a prospective employee.  Defendants also started to demand that captive insurance agents hire additional staff.

42.     Defendants also suspend and terminate employees' access to their office computer, which means that the employee is unable to perform their job functions and ultimately results in the employee's dismissal.

43.     In making decisions relating to suspension or termination, Defendants treat captive insurance agents the same as call center agents and expect captive insurance agents to have the

same clientele as the call center agents. Defendants base their performance metrics for captive insurance agents on the statistics of Defendants' call center agents.

    a.  Defendants will suspend captive insurance agents and their staff if they are selling insurance to more married individuals, people with more college education, or people with more home ownership than their counterparts in the call centers.

44.    Captive insurance agents are rightfully employees of Defendants.  They are eligible to participate in portions of Defendants' ERISA-controlled plans but have been denied participation in Defendants' other ERISA-controlled plans including traditional and Roth 401(k), as well as profit sharing plans for which other similarly situated employees are permitted to participate.

*GEICO Field Representative Agreement*

45.    While Plaintiffs signed an agreement purporting to make them independent contractor, the agreement belies this position, and Defendants have not followed the agreement in this regard.

46.    Section (B) of the GEICO Field Representative agreement states that Plaintiffs are independent contractors, and in the *same sentence*, Defendants agree that a captive insurance agent "exercises his or her own judgment as to the manner in which she or he may provide services under the terms of this Agreement."  As noted above, Defendants did not and do not follow this part of their agreement.  Captive insurance agents have not been able to exercise their own judgment as to the manner in which they provide services as an employee of Defendants.  Defendants instead control the manner in which captive insurance agents provide services by, among other things, requiring agents to follow a specific script, to maintain certain office hours, to discipline staff, to

maintain their office in a certain manner, and to use only GEICO-provided equipment. Defendants also prohibit many avenues that captive insurance agents could use to obtain business, such as purchasing leads, continuing business relationships, and certain forms of advertising. In reality, captive insurance agents seldom (if ever) are able to use their own judgment regarding the manner in which they provide services. Instead, in the past three to six years, Defendants have treated captive insurance agents the same as they treat call center agents—they have the same training, the same script, the same phone and computer systems, and the same metrics. The only conclusion is that captive insurance agents are not independent contractors but are instead GEICO employees.

47. Furthermore, Section (B) of the GEICO Field Representative agreement provides that captive insurance agents "will not participate in or benefit from any GEICO employee benefit programs." This too is false, as GEICO permitted its captive insurance agents, including Plaintiffs, to participate in GEICO's employee health and life insurance benefits.

48. The GEICO Field Representative agreement also provides that "all control, rights and privileges over the business remains with GEICO" and "reserves the right without prior notice to modify or revise the existing [commission] schedules."

*Captive Insurance Agents Are Employees*

49. Within the past three to six years, Defendants have switched from treating their captive insurance agents as independent contractors to employees. In fact, Defendants treat their captive insurance agents the same as their call center agents except for two differences—pay and benefits.

50. While Defendants provide some ERISA benefits to its captive insurance agents, they do not provide all of the benefits to those agents. If all benefits had been offered to the captive insurance agents, Plaintiffs would have participated in the retirement, health, and other benefits.

51.     To the extent Plaintiffs' claims are construed to be directed to the interpretation of the applicable ERISA plans and not their legality, and to the extent any administrative remedies arguably were available (they were not to Plaintiffs), it was or would have been futile for Plaintiffs and the Class to pursue them through any administrative scheme. In submitting an ERISA based claim by Plaintiffs, Defendants will or would have claimed, as is evident in their Motion to Dismiss, wrongfully, that Plaintiffs and the Class are not covered under Defendants' ERISA-controlled plans and hence, there was no administrative remedy that could have been pursued by Plaintiffs before the filing of this action. *See* Doc. #22-1, PAGEID #268 ("Here, Plaintiff is an insurance agent (Compl. ¶ 1.) This fact, on its own, shows that he is not an employee under ERISA."). In addition, Plaintiffs do not have the applicable ERISA Plan and Administrator information making their ability to pursue an administrative remedy impossible before the filing of this action. Hence, any claim for a failure to exhaust administrative remedies simply does not apply to the facts presented here.

*Mr. Moyer's Unlawful and Retaliatory Termination*

52.     On March 21, 2023, just 40 days after this lawsuit was filed by Mr. Moyer, counsel for the Defendants in this matter sent a letter to counsel for Plaintiffs and informed them that Mr. Moyer was terminated. This termination was communicated to counsel for the Plaintiffs before Mr. Moyer's manager, Jordan Cober, communicated the termination to him.

53.     In bold, underlined print, the letter sent from Counsel for the Defendants in this matter indicated "In no uncertain terms, … It [the termination of Mr. Moyer] is wholly unrelated to the above captioned lawsuit that you filed previously in the U.S. District Court for the Southern District of Ohio."

19

54.     Rather Defendants counsel indicated that Mr. Moyer was terminated because of "consistently subpar performance as a GFR."

55.     Allegations that Mr. Moyer had a "consistently subpar performance as a GFR" is false and instead, was a pretext for his termination because Mr. Moyer filed this lawsuit against Defendants seeking ERISA benefits.  This point was confirmed as Defendants did not have any current data to support the claim that Mr. Moyer consistently had subpar performance as a GFR as the data that could arguably support such a contention simply did not exist as it is calculated six months in arears.  In fact, it is anticipated that the data will actually show that Mr. Moyer was actually outperforming Defendants' call center agents at the time of his termination.

56.      Defendants have historically required Plaintiffs to grow and increase the amount of business they did with car dealerships. Defendants provided training on how to increase sales through the dealership program.

57.     As Defendants saw increased loss ratios from the auto insurance policies they had written, they began to analyze the impact of sales initiatives like the dealership program.

58.     In April 2022, Defendants started to provide Plaintiffs with statistics regarding the loss ratios of the business they sold, broken out by dealership business and non-dealership business.

59.     Prior to April 2022 there were no statistics provided by the Defendants to Plaintiffs regarding the dealership program and the associated loss ratios.

60.     Defendants provided Plaintiffs with a list of specific dealerships that they were not permitted to include in their dealership program. Prior to September 29, 2022, that list included twenty-six dealerships across the United States. None of the twenty-six dealerships were in Mr. Moyer's territory or even in the state of Ohio.

61.     As of September 29, 2022, Defendants provided Plaintiffs with an updated list of specific dealerships they were not permitted to include in their dealership program. This list included approximately three hundred and sixty-two dealerships.

62.     Defendants sought and received approval for rate increases effective September 30, 2022, between 12.2% and 34.7%.

63.     On November 2, 2022, Mr. Moyer's zone manager, James Azzarelli, and his manager, Jordan Cober, (Defendants employees) informed Mr. Moyer that his loss ratio with dealerships was too high, and he needed to take action to improve his loss ratio.

64.     Ms. Cober and Mr. Azzarelli gave Mr. Moyer sixty days to prepare a plan to provide details regarding his actions to improve the loss ratios.

65.     Ms. Cober and Mr. Azzarelli also informed Mr. Moyer that he needed to terminate his entire dealership program immediately.

66.     Mr. Moyer was advised by Ms. Cober and Mr. Azzarelli to encourage full payment of premiums, to collect the greatest amount of premium upfront, and to sell higher policy limits.

67.     Mr. Moyer immediately implemented the three mandates from his manager. He terminated his dealership program, he encouraged full premium payment of customers and sold higher policy limits. This was documented and shared with  Ms. Cober and Mr. Azzarelli, within two days of the November 2, 2022 meeting.

68.     On December 8, 2022, Mr. Moyer received an email from the email address GFRQandUWT@geico.com which indicated the following loss ratios for Mr. Moyer: Dealership LR 144.4%, Non-Dealership LR 110.5%, Total GFR LR 125.5%, and Radio Mkt Phone LR 112.1%. The Radio Mkt Phone LR were the call center agents' loss ratio. These statistics were based on August 2021 through July 2022 data.

69.     Following Mr. Moyer's meeting with Mr. Azzarelli on January 19, 2023, Mr. Azzarelli emailed the statistical data related to Mr. Moyer's performance and included the statement "Keep Up The Good Work".

70.     On January 24, 2023, Mr. Moyer received an email from the email address GFRQandUWT@geico.com which indicated the following loss rations for Mr. Moyer: Dealership LR 138.1%, Non-Dealership LR 101.7%, Total GFR LR 118.0%, and Radio Mkt Phone LR 113.6%. These statistics were based on October 2021 through September 2022.

71.     All three statistics related to Mr. Moyer's business improved, while the final statistic, the loss ratio for the call center agents, showed an increase in the call center agents' loss ratio.

72.     The statistics used in the data shared on January 24, 2023, were based on data prior to the meeting with Mr. Moyer on November 2, 2022, yet his numbers had improved while the call center agents' loss ratios actually increased.

73.     On February 23, 2023, Mr. Moyer met with Mr. Azzarelli, via zoom. Mr. Azzarelli shared the most current statistics Defendants could provide and then sent Mr. Moyer an email with detailed statistics.

74.     No negative comments or feedback was provided to Mr. Moyer on that February 23, 2023 meeting, rather he was again praised for his performance.

75.     In January 2022 Mr. Moyer collected 6.6% of the full premium from customers, and in January 2023, he collected the full premium from 25% of the customers.

76.     Mr. Moyer met with his zone manager, James Azzarelli, on November 21, 2022, December 9, 2022, January 19, 2023, and February 23, 2023 via zoom. No negative feedback or requests to improve were communicated verbally or in email to him.

77.     Mr. Azzarelli stated that Mr. Moyer had implemented everything they asked of him and if he continued to sell as he had been along with the rate increases that Defendants implemented in September 2022, his numbers would continue to improve.

78.     During entire duration of Mr. Moyer's career with Defendants he has never been written up or put on probation.

79.     Following Mr. Moyer's termination at least one senior level employee of Defendants contacted him and indicated that Mr. Moyer had never been in trouble and had done everything Defendants had asked of him.

80.     At the time of Mr. Moyer's termination, the most recent statistical data available was from October 2022 – the month before managements' meeting with Mr. Moyer.

81.     There was no legal or justifiable reason to terminate Mr. Moyer's employment with Defendants in March 2023. Instead, Mr. Moyer was unlawfully terminated solely because he filed a lawsuit against Defendants seeking recovery of ERISA benefits.

82.     According to a Forbes article, "Crucial Takeaways from Berkshire Hathaway's 2022 Earnings and Buffett's Annual Letter" by Bill Stone on February 25, 2023 "Underwriting results were poor in 2022, but the real culprit was GEICO, with significant underwriting losses. Berkshire Hathaway Primary Group and Berkshire Hathaway Reinsurance Group has underwriting gains for 2022. Geico continues to suffer from more frequent auto claims and rising claim severity due in part to the higher valuation of used vehicles. According to the Mannheim index, used vehicle prices have fallen from their peak, but prices are still 42% above the level at the end of 2019. GEICO expects to generate an underwriting profit in 2023 since it received approval to raise premium rates due to the increased claim costs."

## CLASS ACTION ALLEGATIONS

83.     Plaintiffs incorporate each and every allegation contained in the preceding paragraphs by reference as if fully set forth herein.

84.     Plaintiffs, in accordance with Rule 23(b) of the Federal Rules of Civil Procedure, brings this action on behalf of themselves and as a member of the Class of captive insurance agents who sell and have sold insurance products for or on behalf of Defendants.

85.     Defendants have exercised the same level of control on all other captive insurance agents, including but not limited to mandating certain scripts and processes, disciplining staff, monitoring office appearance, and mandating certain workdays and hours.

86.     All other captive insurance agents also were eligible to participate in GEICO's employee health and life insurance benefit plans.

87.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling and accrual issues, and ending on the date of entry of judgment.

88.     Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

89.     The following are excluded from the Class: (a) any Judge or Magistrate presiding over this action and members of their families; (b) the officers, directors, or partners of Defendants; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

90.     The Class is so numerous that joinder of all members is impracticable.  The proposed Class contains hundreds, if not thousands, of similarly situated current and former captive insurance agents, who were wrongfully designated as independent contractors by Defendants, throughout the country and sell or service Defendants' insurance products.

91.     There are questions of law and fact common to the Class.  These common questions include, but are not limited to, whether the captive insurance agents are employees of Defendants entitled to all ERISA benefits available to other similarly situated employees and whether Plaintiffs and the Class are entitled to benefits and reimbursement for benefits they should have been receiving as employees.

92.     The claims of Plaintiffs are typical of the claims of the Class members in that Plaintiffs and each member of the Class all are or have been captive insurance agents and have suffered and will continue to suffer financial hardship and other damage as a result of Defendants' conduct.

93.     Plaintiffs will fairly and adequately represent and protect the interest of the Class. Plaintiffs are articulate and knowledgeable about their claims and fully able to describe them. There are no conflicts of interest between Plaintiffs with respect to the interests of the Class members.  Plaintiffs, like the Class members, have suffered financial loss as a result of Defendants' acts.

94.     Counsel for Plaintiffs are well-suited to represent the interests of the Class at large. Counsel include James E. Arnold, Damion M. Clifford, Gerhardt A. Gosnell II, Stefanie L. Coe, and Tiffany L. Carwile (Arnold & Clifford, LLP).  The combined experience and areas of professional concentration of these attorneys are well-suited to representation of the interests of the Class.  All these lawyers practice complex civil litigation and are experienced in class action litigation.

95.     Class certification is appropriate pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure.  Prosecuting separate actions would create a risk of adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of the

other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

96.    Class certification is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.  Defendants will continue to commit the alleged violations, and the members of the Class will continue to be unfairly denied benefits compensation to which they are entitled under ERISA.  Defendants have acted and refused to act on grounds that apply generally to the Class so that final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

97.    Class certification is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure.  The questions of law or fact common to the members of the Class, described above, predominate over any questions affecting only individual members.

98.    This Court is an appropriate forum for the litigation of the Class claims.

## Count I
## Declaratory Relief Under ERISA

99.    Plaintiffs incorporate each and every allegation contained in the preceding paragraphs by reference as if fully set forth herein.

100.    Plaintiffs, for themselves and on behalf of the Class members, seek a declaration pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and 28 U.S.C. §§ 2201 and 2202, of their rights under federal law and Defendants' plans.  Specifically, Plaintiffs, for themselves and on behalf of the Class members, seeks a declaration that

  a.   Plaintiffs and the Class members are employees;

  b.   As employees, Plaintiffs and the Class members are eligible for all benefits under the plan or plans Defendants offer to other employees; and

    c.   Plaintiffs and the Class are entitled to reimbursement of payments made for benefits received and restitution of benefits improperly withheld by Defendants in order to comply with ERISA's requirements.

**Count II**
**Injunctive Relief**

101.    Plaintiffs incorporate each and every allegation contained in the preceding paragraphs by reference as if fully set forth herein.

102.    Defendants have been withholding benefits properly due to its captive insurance agents.

103.    Defendants also have captive insurance agents pay 100% for benefits that they afford to call center agents at a discount.

104.    That practice continues today and has damaged Plaintiffs and the Class members.

105.    Plaintiffs and the Class members therefore request that this Court issue an injunction prohibiting Defendants from continuing to misclassify the captive insurance agents as independent contractors, prohibiting Defendants from continuing to withhold employee benefits from the captive insurance agents, prohibiting Defendants from implementing benefits plans that do not comply with ERISA, and ordering Defendants to recalculate and pay benefits under the proper calculations of benefits as provided by ERISA to Plaintiffs and the Class.

**Count III**
**Claim for Benefits Under ERISA § 502(a)(1)(B)**

106.    Plaintiffs incorporate each and every allegation contained in the preceding paragraphs by reference as if fully set forth herein.

107.    ERISA § 502(a)(1)(B) [29 U.S.C. § 1132(a)(1)(B)] authorizes a participant or beneficiary of a plan to bring a civil action to recover benefits due under the terms of the plan, to

27

enforce his rights under the terms of the plan, and to clarify his rights to future benefits under the plan.

108. Defendants provide a traditional and Roth 401(k) plan, a group health care plan, a group dental plan, a profit-sharing plan, a group life plan, and a long-term disability plan to current employees, all of which are employee benefit plans subject to ERISA.

109. As employee-benefits plans subject to ERISA, Defendants' plans must comply with 26 U.S.C. §§ 105(h) and 410(b), including the minimum coverage requirements.

110. The definitions applicable to ERISA make clear that employees and only employees are eligible to participate in the benefit plans:

   a. An employee welfare benefit plan is "any plan, fund, or program . . . maintained by an employer . . . that . . . was established or is maintained for the purpose of providing for its participants or their beneficiaries . . . (A) medical, surgical, or hospital care or benefits . . . ." 29 U.S.C. § 1002(1);

   b. An employee pension benefit plan is "any plan, fund, or program . . . maintained by an employer . . . that by its express terms . . . : (i) provides retirement income to employees, or (ii) results in a deferral of income by employees . . . ." *Id.* § 1002(2);

   c. An employer is any person acting directly as an employer. *Id.* § 1002(5);

   d. An employee is any individual employed by an employer. *Id.* § 1002(6);

   e. A participant is "any *employee* . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees or such employer . . . ." *Id.* § 1002(7) (emphasis added).

111.    Because a participant must be an employee and because the term "employee" does not have different definitions based on the type of plan, if an individual is treated like an employee for one employee benefit plan—*i.e.* health or life insurance—then that individual is also an employee for any other plan offered by the employer.

112.    A plan that fails to comply with the statutory requirements must be brought into retroactive compliance.

113.    Upon information and belief, Defendants' health and life insurance benefit plans are not multiemployer plans as described in 29 U.S.C. § 1002(37) and (40).

114.    Relying on the mischaracterization of Plaintiffs and the Class members as independent contractors, Defendants have systematically excluded Plaintiffs and the Class members from the definition of employee as applied to some of Defendants' benefit plans.

115.    For their health and life insurance plans, Defendants treat Plaintiffs and the Class members as employees by allowing them to participate in those plans, as long as they pay the entire health and life insurance premiums.

116.    Defendants, however, cannot treat Plaintiffs and the Class members as employees for portions of the benefit plans but as independent contractors for other portions of the plans. Thus, based on Defendants' treatment of Plaintiffs and the Class members, they are employees under ERISA for all of Defendants' ERISA-controlled benefit plans.

117.    By excluding Plaintiffs and the Class members from participation in some of their plans, Defendants have violated ERISA's statutory provisions.

118.    Defendants' refusal to implement its benefit plans in compliance with ERISA and 26 U.S.C. §§ 105(h) and 410(b) was and is unlawful.

119.     Defendants' ERISA violations have damaged Plaintiffs and the Class, including but not limited to the loss of benefits due to them had the traditional and Roth IRAs, 401(k) plan, profit sharing plan, a group health care plan, a group dental plan, group life plan, and a long-term disability plan offered to all other current employees.

120.     Defendants' conduct has caused actual harm to Plaintiffs and the Class members in an amount in excess of $5 million.

<u>**Count IV**</u>
**Claim for Benefits Under ERISA § 502(a)(1)(B)**

121.     Plaintiffs incorporate each and every allegation contained in the preceding paragraphs by reference as if fully set forth herein.

122.     ERISA § 502(a)(3) empowers a plan participant or beneficiary to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1332(a)(3).

123.     At a minimum, Plaintiffs and the Class members are plan participants, as they are eligible or may be eligible for Defendants' health and life insurance plans.  Indeed, Mr. Moyer has participated in Defendants' health and life insurance plans.  He has participated in the life insurance plans since his initial employment with Defendants in 2007.  He participated in Defendants' health insurance plan for approximately one year, around 2011.

124.     Defendants' refusal to implement their benefit plans in compliance with ERISA and 26 U.S.C. §§ 105(h) and 105(h) was unlawful and is a breach of their fiduciary duties to administer a plan in accordance with ERISA.

125.     Plaintiffs and the Class members are entitled to equitable relief under ERISA § 502(a)(3), including reformation of all of Defendants' benefit plans to include Plaintiffs and the Class and the payment of restitution in the form of a surcharge or otherwise credit Plaintiffs and the Class members for all ERISA benefits to which they are retroactively entitled under Defendants' benefit plans in order to be made whole and to prevent Defendants' unjust enrichment.

126.     Defendants' conduct has caused actual harm to Plaintiffs and the Class members in excess of $5 million.

**Count V**
**Retaliatory Termination Under ERISA § 510**

127.     Plaintiff Moyer incorporates each and every allegation contained in the preceding paragraphs by reference, as if fully set forth herein.

128.     ERISA makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled" under ERISA.  29 U.S.C. § 1140.

129.     Mr. Moyer is a participant in ERISA benefits, as he had received life insurance benefits through Defendants.

130.     On March 21, 2023, 40 days after Mr. Moyer filed his lawsuit seeking additional benefits to which he is entitled, Defendants terminated his employment.

131.     Defendants' termination of Mr. Moyer's employment was retaliation for his filing of this lawsuit seeking benefits to which he is entitled under ERISA.  Such termination is unlawful pursuant to Section 510 of ERISA.

132.     As a direct and proximate result of Defendants' unlawful termination of Mr. Moyer, Mr. Moyer has suffered damages in excess of $75,000.

### Prayer for Relief

**Wherefore,** Plaintiff Moyer and the Class pray as follows:

A.      Certify this action as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, designate Plaintiffs as the Class representatives, and counsel for Plaintiffs as Class Counsel;

B.      A declaration that Plaintiffs and the Class members are legal employees for all purposes;

C.      A declaration that, because Defendants excluded Plaintiffs and the Class from participating in their employee benefit plans, the Defendants' benefit plans are not in compliance with ERISA and 26 U.S.C. §§ 105(h) (and 410(b);

D.      Payment to Plaintiffs and the Class of all amounts due under the Defendants' employee benefit plans had the plans complied with ERISA;

E.      An order reforming all of Defendants' employee benefit plans to include Plaintiffs and the Class and to comply with ERISA and 26 U.S.C. §§ 105(h) and 410(b);

F.      An order requiring Defendants to pay restitution in the form of a surcharge or otherwise credit Plaintiffs and the Class members for all ERISA benefits to which they were retroactively entitled under the Defendants' employee benefit plans in order to be made whole and to prevent Defendants' unjust enrichment;

G.      An injunction barring Defendants from continuing to misclassify the Class and Plaintiffs as independent contractors and to classify them as employees;

H.      An award of damages for the unlawful termination of Mr. Moyer;

I.      An award of attorneys' fees, plus the costs and expenses of this action;

J.      Pre- and post-judgement interest;

K. All other legal and equitable relief to with Plaintiffs and the Class are entitled.

Respectfully submitted,

*/s/ Damion M. Clifford*
James E. Arnold (0037712)
Damion M. Clifford (0077777)
(Trial Counsel)
Gerhardt A. Gosnell II  (0064919)
Stefanie L. Coe (0078265)
Tiffany L. Carwile (0082522)
ARNOLD & CLIFFORD LLP
115 W. Main St., 4th Floor
Columbus, Ohio  43215
Ph: (614) 460-1600
Email: jarnold@arnlaw.com
   dclifford@arnlaw.com
   ggosnell@arnlaw.com
   scoe@arnlaw.com
   tcarwile@arnlaw.com

*Counsel for Plaintiffs*

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury as to all issues so triable.

*/s/ Damion M. Clifford*
Damion M. Clifford